# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

_____ )
In re                                                      )
                                                           )        Chapter 11
     SUSAN D. BURM,                             )        Case No. 14-12139-HJB
                                                           )
               Debtor         )
_____ )
                                                           )
     SUSAN D. BURM,                             )
                                                           )
              Plaintiff        )        Adversary Proceeding
v.                                                        )        No. 14-1131
                                                           )
     RAYMOND B. JOHNSON, III               )
     and RAYMOND PILING                        )
     PRODUCTS, INC.,                              )
                                                           )
           Defendants       )
_____ )

## <u>MEMORANDUM OF DECISION</u>

Before the Court after trial is a complaint filed by Susan D. Burm, the debtor in the underlying Chapter 11 bankruptcy case (the "Debtor"), objecting to two claims filed by creditor Raymond Piling Products, Inc. ("RPP"). The Debtor argues that RPP does not hold valid claims against her because the underlying bases for those claims, two promissory notes and accompanying mortgages, are void and unenforceable for various reasons, including, *inter alia*, that they violate the federal Equal Credit Opportunity Act and the Massachusetts usury statute.

1

I.    <u>FACTS AND TRAVEL OF THE CASE</u>[1]

In 1979, the Debtor's husband, Joseph Burm ("Joseph") organized Tuckerman Steel Fabricators, Inc. ("Tuckerman Steel"), a now-defunct Massachusetts corporation that fabricated steel structures for use in the construction industry.  At all relevant times, Joseph served as Tuckerman Steel's president and sole shareholder.  The Debtor was not a director, shareholder, or employee of Tuckerman Steel and had no involvement in Tuckerman Steel or any other steel business at that time.

Raymond Johnson ("Johnson") is and has been president and owner of RPP (together with Johnson, the "Defendants") since 1996.  RPP is a steel manufacturer agent, buying and selling used steel.  From 2005 through 2012, RPP and Tuckerman Steel worked on several projects together, with RPP both selling steel to Tuckerman Steel and providing Tuckerman Steel with subcontracting jobs.  Eventually, RPP began providing financial assistance to Tuckerman Steel. On numerous occasions between 2005 and 2012, Joseph and Tuckerman Steel's general manager, Harry Webster ("Webster"), approached Johnson seeking financing for certain Tuckerman Steel projects. Typically, Joseph or Webster would e-mail Johnson with a proposal for RPP to purchase certain of Tuckerman Steel's third-party invoices at a discount.  On some occasions, Tuckerman Steel arranged for its customer to pay RPP directly.  On other transactions, RPP relied on Tuckerman Steel to collect the payment from the customer and forward it to RPP.

In September of 2009, Johnson became aware of occasions when Tuckerman Steel failed to remit to RPP customer payments that Tuckerman Steel had received on

---

[1] The facts described herein are drawn from the Admitted Facts of the Amended Joint Pretrial Statement filed July 6, 2015, witness testimony, and the various exhibits admitted at trial.

invoices RPP had purchased.  As Joseph testified with regard to payments on invoices sold to RPP, "[s]ometimes we gave it to Mr. Johnson, sometimes we didn't." Dec. 15, 2015 Trial Transcript 22:17-23:1.  Toward the end of 2010, when a number of Tuckerman Steel checks to RPP had been returned for insufficient funds, Johnson called for a meeting with Joseph and Webster.  At that meeting, the parties came to an understanding that Tuckerman Steel owed approximately $2 million to RPP and RPP would not continue any further financing activities.

After that meeting, Johnson discovered that Tuckerman Steel had collected and failed to turn over yet another payment on an invoice purchased by RPP.  On February 22, 2011, Johnson met with Joseph and again stated that RPP would no longer engage in financing transactions with Tuckerman Steel.  Furthermore, Johnson said he intended to notify certain general contractors working with Tuckerman Steel that Joseph had been lying and stealing from RPP.  In lieu of such drastic measures, however, Johnson alternatively proposed to convert all of Tuckerman Steel's obligations to RPP into a 15-year note secured by a mortgage on property that Johnson believed was owned by Joseph on Martha's Vineyard, at 65 Slough Cove Road, Edgartown, Massachusetts (the "Vineyard Property").

Johnson soon learned, however, that Joseph was not the titleholder of the Vineyard Property. Instead, the Vineyard Property was owned by the Slough Cove Trust (the "Trust"), a nominee trust under which Joseph and the Debtor were co-trustees.  After reviewing a copy of the deed reflecting that title to the Vineyard Property was held by the Trust, Johnson asked that the promissory note and mortgage also be signed by the Debtor.

3

On February 24, 2011, Joseph and the Debtor executed a note (the "First Vineyard Note"), in the principal amount of $2,077,886.39 made payable to "Raymond B. Johnson, III, individually and/or as President of Raymond Piling Products, Inc.," with a stated interest rate of 5 percent per annum and a stated default rate upon demand of 8 percent. Pl. Ex. 1.  Although the First Vineyard Note identifies the makers as "Joseph W. Burm, Individually, *Susan D. Burm, Individually*, and Joseph W. Burm and Susan D. Burm as Trustees of Slough Cove Trust" (emphasis supplied), it is signed by "Joseph W. Burm, Individually and as Trustee of Slough Cove Trust" and "Susan D. Burm, Trustee of Slough Cove Trust."   However, the associated mortgage (the "First Vineyard Mortgage") (executed the same day in favor of Johnson, "individually and/or as President of Raymond Piling Products, Inc."), is signed by "Joseph W. Burm, Individually and as Trustee of Slough Cove Trust" and "Susan D. Burm, *Individually* and as Trustee of Slough Cove Trust."  Pl. Ex. 2 (emphasis supplied).

In early 2012, Tuckerman Steel ceased its operations.  Miraculously, however, the Debtor – with no previous role whatsoever in the steel business – incorporated a new steel fabricating business, Boston Bridge & Steel, Inc. ("BBS") which, coincidentally, hired Joseph as one of its employees.   Like a phoenix rising from the ashes, BBS occupied the same space that had previously been occupied by Tuckerman Steel and hired some of the same employees that had previously worked at Tuckerman Steel, including Tuckerman Steel's former bookkeeper, Debbie Driscoll ("Driscoll"). According to the Debtor, the Debtor performed administrative functions for BBS, such as communicating with engineers and reviewing payroll, while Joseph was responsible for sales.  Despite Johnson's negative experiences with Tuckerman Steel, he assisted BBS in early 2012

4

during its nascent stage by providing BBS with a number of welding jobs that served as BBS's sole source of income.

On September 27, 2011, the Vineyard Property was transferred from the Trust to the Debtor individually.  Seven payments were made on the First Vineyard Note, but no payments were made after October 15, 2011.  On December 22, 2011, Johnson sent Joseph an e-mail with the subject line "Joe please confirm you have forwarded to your wife Thanks." (sic) In that e-mail, Johnson explained that the mortgage payments on the First Vineyard Note were two months in arrears.  He offered to provide the Burms with a six-month forbearance period during which Johnson would refrain from foreclosing upon the First Vineyard Note and freeze principal and interest payments in order to give the Burms an opportunity to sell the Vineyard Property and pay off the note.  In exchange for agreeing to forbear on collection under the First Vineyard Note, Johnson requested that an additional $186,000.00 be secured by a mortgage on the Vineyard Property, representing amounts paid by RPP on behalf of Tuckerman Steel subsequent to the execution of the First Vineyard Note and Mortgage.

The Debtor testified that she wanted to take advantage of the offered forbearance.  On January 20, 2012, Joseph (individually and on behalf of Tuckerman Steel) and the Debtor (individually) signed a second promissory note in the amount of $192,271.68 (the "Second Vineyard Note") made payable to "Raymond Piling Products, Inc. and Raymond B. Johnson, III."  Pl. Ex. 3.  The stated interest rate in the Second Vineyard Note was 5 percent per annum, and the stated default rate upon demand was 8 percent.  On that same date, the Debtor (individually) also executed a mortgage on the Vineyard Property in favor of RPP and Johnson (the "Second Vineyard Mortgage").

After a couple of revisions, a forbearance agreement was finalized and executed on January 27, 2012 (the "Forbearance Agreement").  The agreement was signed by Johnson (individually and as president of RPP), Joseph (individually, as president of Tuckerman Steel, and as trustee), and the Debtor (individually and as trustee).  Def. Ex. 265.  In the Forbearance Agreement, the parties acknowledged that: 1) after execution of the First Vineyard Note, the "lenders" (identified as RPP and Raymond B. Johnson, III) extended an additional amount of $192,271.68 (the "Subsequent Advances") to the "obligors" (identified as Joseph W. Burm, Susan D. Burm, and Tuckerman Steel Fabricators, Inc.); 2) the obligors were in default under the terms of the First Vineyard Note and had not made payment on the Subsequent Advances; and 3) the lenders agreed to suspend the monthly payments due under the First Vineyard Note and the Subsequent Advances for six months beginning on January 1, 2012 in exchange for a second promissory note in the original principal amount of $192,271.68 secured by a second mortgage on the Vineyard Property executed by the Debtor.  Id.

In paragraph 2 of the Forbearance Agreement, the Defendants and the Burms "confirm[ed] that the amount owed to the Lenders under the First Note and the Second Note, as of the date [of the Forbearance Agreement] [was] $2,202,918.80 in principal, together with interest, late fees, attorney's fees, and other costs and charges due pursuant to the Loan Documents."  Id.  And paragraph 3 of the Forbearance Agreement contained a "Waiver of Defenses and Claims and Restatement and Acknowledgement of Obligations" (the "Waiver"), stating (in relevant part):

> The Obligors and the Trust hereby reaffirm and restate their unconditional, primary, joint and several Obligations to the Lenders as set forth above.  Without limiting the generality of the foregoing sentence, the Obligors and the Trust, jointly and severally, specifically acknowledge, state

6

and reaffirm that (i) the Mortgage is valid and enforceable, and properly and fully secures the payment and performance of the First Note, (ii) the Second Mortgage is valid and enforceable, and properly and fully secures the payment and performance of the Second Note. The Obligors and the Trust, jointly and severally, irrevocably waive, to the extent they ever existed, each and every defense, setoff and/or counterclaim to the payment of their liabilities and Obligations to the Lenders and any claims against the Lenders. . . and the Lenders . . . are released, remised and forever discharged from any and all claims of the Obligors and the Trust, jointly and severally, in consideration for the Lenders' agreements contained herein.

Id. at ¶ 3.

When the forbearance period expired, the Burms had neither sold the Vineyard Property as contemplated nor made any further payments on the First and Second Vineyard Notes. On July 12, 2012, Johnson and RPP filed suit against the Debtor, Joseph, and Tuckerman Steel in the Massachusetts Superior Court (the "Superior Court Case"). Because the parties could not agree on the amount of Tuckerman Steel's indebtedness to RPP, a third-party financial professional, Christine Schneider, C.P.A. ("Schneider") was jointly engaged to lend her assistance. On February 14, 2014, Schneider provided a report in which she determined that the "supported" amount Tuckerman Steel owed to RPP was $1,751,549.00.[2]

---

[2] According to the Summary of Terms sheet included with Schneider's report, a "supported amount" was defined as an

[a]mount that is fully supported by evidential materials. In the case of transactions between RPP and Tuckerman, a transaction or amount was considered supported if evidential materials were examined in the records of both parties. In the case of a transaction with a third party, a transaction or amount was considered to be supported if evidential materials were examined that corroborated the existence of the transaction, the project the transaction pertained to, and if applicable, the receiver of product.

Pl. Ex. 58. "Evidential materials," in turn, were defined as "documents that provide evidence that a transaction occurred…consist[ing] of contracts, purchase orders, invoices, bills of lading, cancelled checks, bank statements." Id.

The Superior Court Case was stayed, however, when the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on May 7, 2014.[3]  RPP and Johnson filed four proofs of claim in the Debtor's bankruptcy case, two of which have been withdrawn.  The remaining two proofs of claim, objected to by the Debtor, are claim numbers 6 and 9, filed by RPP, in the amounts $2,366,683.37 and $216,305.58, respectively ("Claim 6," "Claim 9," and, together, the "Claims").  The Vineyard Property was eventually sold during the course of the bankruptcy case, and, after satisfaction of a senior lien, the balance of the sale proceeds ($2,065,962.28) was put in escrow pending the outcome of this dispute.

The Debtor initiated the instant adversary proceeding against the Defendants on June 30, 2014 by filing a complaint objecting to the Claims.  In the complaint, as later amended (the "Complaint"), the Debtor objects to the Claims alleging (1) violations of the Equal Credit Opportunity Act (Count I); (2) breach of contract (Count V); (3) violations of Massachusetts' consumer protection statute, chapter 93A ("Chapter 93A") (Count VI); (4) violations of the Massachusetts usury statute (Count VIII); and (5) Illegality (Count IX). The remaining counts of the Complaint have been dismissed.[4]  The Defendants filed counterclaims against the Debtor, alleging (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) unjust enrichment.[5]  Trial ensued over the

---

[3] See 11 U.S.C. § 101 et seq. (the "Bankruptcy Code" or the "Code"). All references to statutory sections are to the Bankruptcy Code unless otherwise specified.

[4] Those counts were for fraud (Count II), duress (Count III), and civil conspiracy (Count IV).  The remaining Count VII, titled "Objections to Claims" seeks disallowance of the claims based on the remaining alleged violations.

[5] The Defendant's remaining counterclaim for violations of Chapter 93(A) has been dismissed.

course of three days, with five witnesses appearing: the Debtor, Christine Schneider, Deborah Driscoll, Joseph Burm, and Raymond Johnson. At the conclusion of trial, this Court took the matter under advisement.

## II.   POSITIONS OF THE PARTIES

### A.   Usury

The Debtor first argues that RPP's claims are unenforceable because the underlying transactions (i.e., the original financial transactions between RPP and Tuckerman Steel) were usurious. The Debtor maintains that the transactions were loans or unsecured accounts receivable financing subject to the Massachusetts usury statute. And since, according to the Debtor, the interest rates on those transactions far exceeded the Massachusetts usury statute's 20% per annum threshold and RPP exploited Tuckerman Steel's financial desperation, a declaration that the transactions are void is justified in this case.  The Debtor logically concludes that, if the debts underlying the First and Second Vineyard Notes are void, the notes (and accompanying mortgages) are unenforceable.[6]

The Defendants maintain, however, that the Debtor cannot avail herself of a usury defense because the transactions actually constituted non-recourse factoring agreements, which are not subject to the Massachusetts usury statute.  And since the Debtor's Chapter 93A and Illegality claims are based solely on the Defendant's alleged

---

[6] Although the introduction paragraph of the Complaint states that the Debtor seeks "rescission of two notes and mortgages," it is clear from the substance of the Complaint and the counts contained therein that the Debtor does not seek rescission in its usually understood sense – i.e. the unmaking of a contract "accompanied by restitution of any partial performance, thus restoring the parties to their precontractual positions."  Black's Law Dictionary (10th ed.) at 1499.  Instead, she is clearly seeking a determination that the notes and mortgages are void or unenforceable.

violations of the usury law, the Defendants say those claims too must fail.

### B.   Lack of Consideration

The Debtor further argues that, even if the transactions giving rise to the debt embodied in the First and Second Vineyard Notes are deemed valid, those notes and their associated mortgages are unenforceable as to her individually.  First, the Debtor says that she received nothing of value in exchange for execution of the First Vineyard Note, and thus the contract fails for lack of consideration.  Without liability on the note, the Debtor says, the First Vineyard Mortgage is likewise unenforceable as to her.  Given that the alleged value provided to the Debtor in exchange for signing the Second Vineyard Note and Mortgage and Forbearance Agreement was Johnson and RPP's agreement to forbear from enforcing the First Vineyard Note and Mortgage, which are themselves unenforceable, the Debtor argues that those agreements, too, fail for lack of consideration.

The Defendants respond in two ways.  With respect to the First Vineyard Note and Mortgage, the Defendants say that, under Massachusetts case law, a wife's mortgage of her property to secure her husband's business debt is valid without independent consideration.  With respect to the Second Vineyard Note and Mortgage, the Defendants maintain that since the First Vineyard Note and Mortgage are enforceable against the Debtor, their agreement to forbear from collection activity *did* constitute sufficient consideration.  And the Defendants further argue that the Debtor's (and more importantly, BBS's) continued opportunity to engage in a business relationship with RPP constituted valid consideration for both the Forbearance Agreement and the Second Vineyard Note and Mortgage.

### C.    Documentary Deficiencies

The Debtor next contends that the First Vineyard Note suffers from fatal documentary deficiencies.  The Debtor reads the First Vineyard Note as payable only to Johnson, who was not the proper payee, as he did not personally loan any money to Tuckerman Steel.  Additionally, the Debtor notes that she signed the First Vineyard Note only in her capacity as trustee, and not individually, and concludes that she is therefore not individually liable for any amounts due under the First Vineyard Note.

The Defendants say that identification of the payee on the First Vineyard Note as "Raymond B. Johnson III, individually and/or as President of Raymond Piling Products, Inc." plainly refers to both Johnson individually and in his capacity as president of RPP. The Defendants characterize the Debtor's contrary interpretation as unsupported by a plain and ordinary reading of the document and at odds with the parties' understanding and intent.  No substantive argument was made as to the lack of Debtor's signature in an individual capacity on the First Vineyard Note, and the Defendants appear to admit that the First Vineyard Note was given by the Debtor only in her role as trustee.[7]

### D.    Equal Credit Opportunity Act

Finally, the Debtor asserts that by requiring her to sign the First and Second Vineyard Notes and Mortgages and the Forbearance Agreement, the Defendants violated Regulation B promulgated under the Equal Credit Opportunity Act (the "ECOA"), which prohibits a creditor from requiring a credit applicant's spouse to guarantee a credit instrument.  The Debtor maintains that the ECOA violations render the documents

---

[7] See Defendants' Proposed Findings of Fact and Conclusions of Law, at 2 ¶ 4 (explaining that the First Vineyard Mortgage was given "to secure the payment of a Promissory Note of the same date, given by J. Burm, *individually and as Trustee*, and by *S. Burm as Trustee* . . . .") (emphasis supplied).

unenforceable as to her.

The Defendants challenge the alleged violations of the ECOA first by noting that any such claim is foreclosed by the Waiver contained in the Forbearance Agreement. Second, the Defendants argue that the ECOA is inapplicable because (1) RPP is not a "creditor" within the meaning of the statute and (2) the ECOA regulations allow a secured creditor to require the signature of any person the creditor reasonably believes is necessary to perfect an interest in the property intended to secure the debt.  Accordingly, the Defendants maintain that each of the documents upon which the Claims are based remain enforceable against the Debtor and the Debtor's bankruptcy estate.

### E.    The Amount of the Claims

To say that the parties' evidence regarding the appropriate amount of RPP's Claims was less than clear would be an egregious understatement.  But the Court will refrain from further descriptive commentary and summarize the evidence and arguments as best it is able.

The Debtor argues that the amounts listed in RPP's Claims are vastly overstated. She maintains that there was an understanding between the parties that the amount reflected in the First Vineyard Note was not necessarily correct and would be later adjusted to reflect the actual amount owed.  With regard to her argument that the First Vineyard Note (upon which Claim 6 is based) should be reduced, the Debtor relies on the report prepared by Schneider in connection with the Superior Court Case, which found a "supported" amount owed to RPP of $1,751,549.00.

RPP says that the amounts asserted in the Claims, however, are *less* than the true amount of the debts owed.  Attached to each Claim is a short calculation purporting to

explain how the face amounts of the Claims were determined.  With respect to Claim  6,

the  attachment  lists  principal  and  interest  past  due  as  of  October  1,  2011  as

$2,080,593.17, with 5% interest accrued through the date of the bankruptcy filing in the

amount of $286,090.20, for a total claim of **$2,366,683.37**.  At trial, however, Johnson

described his process of calculating the interest on Claim 6 differently.  He testified that

he:

> took  the  one  million  nine  ninety-seven,  times  a  simple  interest  of  five
> percent.  It came to $99,854. Divided it by twelve, so it was $8,321 a month.
> And there were thirty-one months between the time they defaulted on the
> note and the time they filed in court here, which came to $257,956.27.  And
> then there was [sic] six days in May, so we took the monthly down by the
> day, and added that in, and it came to $259,587.63.

Jan. 19, 2016 Trial Transcript 66:2 – 9.  According to this testimony, the amount of Claim

6 should be **$2,256,587.63**.  But, taking into account penalties authorized under the First

Vineyard Note, he says, the amount in Claim 6 should be higher than what is listed there.

Id. at 66:10 – 13.

In their  post-trial  brief,  the  Defendants  proposed  a  third  explanation  for  their

calculation of Claim 6:

> RPP calculated the amount of Proof of Claim No. 6 by applying 8 percent
> simple interest (the contract rate plus the late payment penalty) to the
> outstanding principal balance of the First Vineyard Note as of the date of
> default  (October  1,  2011)  through  the  filing  date.   RPP  had  initially
> calculated the Proof of Claim incorrectly. . . . Properly calculated, RPP
> seeks **$2,493,232.49**.  The Proof of Claim also seeks costs of collection
> including reasonable attorneys' fees.

Defendants' Proposed Findings of Fact and Conclusions of Law, at 18 ¶ 80 (emphasis

supplied).

With  respect  to  Claim  9,  the  attachment  lists  principal  in  the  amount  of

$192,271.68, plus interest accrued through the date of filing at 5% in the amount of

$24,033.90, for a total claim of **$216,305.58**.   In his testimony, Johnson explained his

calculation of interest saying,

> The five percent annually on the 192 is the $9,613.58, which is $801.13 a
> month.  There were twenty-nine months from the time they went in default
> until they signed – until they filed bankruptcy.  And that's $23,232.77, plus
> another $158.00 for the six days in May, comes to $23,390.80.

Jan. 19, 2016 Trial Transcript 67:17 – 21.  Assuming that the "192" referred to by Johnson

is the amount of the Second Vineyard Note ($192,271.68), a calculation based on this

testimony is a little closer to the amount listed on the proof of claim - **$215,662.48**.  Again,

he explained that the actual amount owed exceeds the amount listed on Claim 9 because

he did not include any of the penalties provided for in the Second Vineyard Note, but

stated that RPP would accept the lower amount.  Id. at 68:6-9.

But in their post-trial brief, the Defendants again proposed an alternative

calculation:

> RPP calculated the amount of Proof of Claim No. 9 by applying 8 percent
> simple interest (the contract rate plus the late payment penalty) to the
> outstanding principal balance of the First [sic][8] Vineyard Note as of the date
> of default (October 1, 2011) through the filing date.  RPP had initially
> calculated the Proof of Claim incorrectly. . . . Properly Calculated, RPP
> seeks **$229,697**. . . . The Proof of Claim also seeks costs of collection
> including reasonable attorneys' fees.

Defendants' Proposed Findings of Fact and Conclusions of Law, at 18 ¶ 81 (emphasis

supplied).

But ultimately the Defendants say that, whatever the "true" amount of the Claims,

RPP would be willing to accept the amounts listed on the Claims as satisfactory.

---

[8] This reference to the *First* Vineyard Note appears to be a typographical error.  The Court
assumes the Defendants meant to refer to the *Second* Vineyard Note.

14

III.   <u>DISCUSSION</u>

### A.   Burden of Proof

It is well settled that a properly filed proof of claim is prima facie evidence of the validity and amount of the claim.  Fed. R. Bankr. P. 3001(f).  The party objecting to a claim bears the initial burden of producing evidence to establish grounds for disallowance.  <u>Juniper Dev. Grp. v. Kahn (In re Hemingway Transp., Inc.</u>), 993 F.2d 915, 925 (1st Cir. 1993).  Once the objecting party produces such evidence, the burden of proof shifts to the claimant to prove the validity of the claim by a preponderance of the evidence.  <u>In re Whet, Inc.</u>, 33 B.R. 424, 437 (Bankr. D. Mass. 1983).  The Debtor has sustained her burden of production by providing the Court with numerous colorable bases for invalidating RPP's Claims, all of which, if successful, would either eliminate or reduce the Debtor's liability for the amounts asserted therein.  Accordingly, the burden of proof rests on the Defendants to demonstrate the validity of the Claims.

### B.   Usury, Illegality, and Violations of Massachusetts General Law c. 93A

Enacted in order to protect the necessitous debtor from outrageous demands by unscrupulous lenders, Massachusetts General Law ch. 271, § 49(a) (the "Usury Statute") makes criminal the charging of interest in an amount exceeding twenty percent per annum unless "the lender complies with . . . registration and record-keeping requirements."[9] <u>Begelfer v. Najarian</u>, 409 N.E.2d 167, 172, 381 Mass. 177 (1980).  The Usury Statute specifically provides:

> [w]hoever in exchange for either *a loan of money or other property*
> knowingly contracts for, charges, takes or receives, directly or indirectly,

---

[9] It is undisputed that the Defendants did not comply (or attempt to comply) with the Usury Statute's requirements for legally charging interest over twenty percent.

> interest and expenses the aggregate of which exceeds an amount greater
> than twenty per centum per annum upon the sum loaned … shall be guilty
> of criminal usury [subject to statutory exceptions, most notably registrations
> with the attorney general].

Mass. Gen. Laws ch. 271, § 49(a) (emphasis supplied).

A usurious loan "may be declared void," Begelfer, 409 N.E.2d at 173, the remedy which the Debtor here seeks.  Other less drastic remedies are also available (such as reducing the amount of interest or striking the offending provision) – "the permissive language of [the Usury Statute] is properly read to empower a court to utilize its full range of equitable powers, including cancellation, in order to reach an appropriate result in each case."  Id. at 173-74.

Before the consideration of an appropriate remedy, however, it must first be determined that the Usury Statute was in fact violated.  By its explicit terms, the Massachusetts Usury Statute applies only to loans.  A "loan" is a transaction that involves an agreement "whereby one person advances money to the other and the other agrees to repay it."  U.S. Dept. of Health & Human Servs. v. Smith, 807 F.2d 122, 134 (8th Cir. 1986).  A loan may be "anything furnished for a temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use."  In re DePasquale, 225 B.R. 830, 832 (B.A.P. 1st Cir. 1998).  In contrast, "[a] sale is the transfer of the property in a thing for a price in money.  The transfer of the property in the thing sold for a price is the essence of the transaction."  Boerner v. Colwell Co., 577 P.2d 200, 206, 21 Cal. 3d 37 (1978) (quoting Milana v. Credit Disc. Co., 163 P.2d 869, 871, 27 Cal. 2d 335 (1945)).

Courts have routinely held that a "sale of accounts receivable . . . at a discounted price," In re Metro. Envtl, Inc., 293 B.R. 893, 895 (Bankr. N.D. Ohio 2003), commonly

referred to as "factoring," is just that – a "sale" and not a loan subject to usury laws.   See,

e.g., Korrody v. Miller, 126 S.W.3d 224, 226 (Tex.App. 2003); Carter v. Four Seasons

Funding Corp., 97 S.W.3d 387, 351 Ark. 637 (2003); Boerner, 21 Cal.3d 37.[10]   Simply

put, the essence of a factoring transaction is: "[a] factor buys accounts receivable at a

discount, the factor's seller obtains immediate operating cash, and the factor profits when

the face value of the account is collected."   Carter, 97 S.W.3d at 395-96.

But commercial transactions are complicated, and the determination of whether a

transfer of interest in accounts receivable is truly a "sale" or whether the payment of the

"purchase price" is in reality a "loan," requires a close look at the details of the transaction.

Indeed, as other courts have noted (contrary to the Debtor's position), the fact that the

parties to the transaction refer to the payment of money as "loans" "is not a matter to be

---

[10] This Court recognizes that at least one Massachusetts court has held that the assignment of future lottery prize payments in exchange for a lump sum payment constitutes a "loan" and not a "sale" of lottery proceeds, thus subjecting the transaction to the Massachusetts Usury Statute. See In re Stone Street Capital, LLC, 30 Mass. L. Rptr. 493, 2012 WL 6765573 (Mass. Super. Ct. Dec. 27, 2012) ("Stone Street I"); In re Stone Street Capital, LLC, 31 Mass. L. Rptr. 171, 2013 WL 3341052 (Mass. Super. May 10, 2013) ("Stone Street II").   The Stone Street court reasoned that because a loan is the "[d]elivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it, with or without interest," Stone Street I, 2012 WL 6765573 at *1 (quoting Murphy v. Charlestown Sav. Bank, 380 Mass. 738, 745 n. 11, 405 N.E.2d 954 (1980); Black's Law Dictionary 844 (5th ed. 1979)), and the lottery winner in essence "agrees to repay [the amount loaned] by assigning his right to future [lottery] payments," id., then the transaction constituted a loan and not a sale.  On reconsideration, the Stone Street court clarified that, even if the transaction bore the hallmarks of a traditional factoring arrangement (i.e., the purchase of "accounts receivable or other collectibles at a discount," Stone Street II, 2013 WL 3341052 at *1 n.2), it still constituted a loan for purposes of the Usury Statute, id. at *1-2.

To the extent the Stone Street rationale was intended to extend beyond the context of transactions involving the assignment of lottery proceeds, however, this Court respectfully disagrees that the sale of accounts receivable under a traditional factoring arrangement constitutes a "loan" within the meaning of the Massachusetts Usury Statute.  While a factor does advance money (the purchase price) that it expects will be "repaid" with a profit, that repayment comes from its right to collect from third parties under the receivables it has bought; it does not come from the person or entity to whom the original money was given.  The profit to the factor arises not from the charge of interest on money lent, but from successful collection of the accounts receivable "yield[ing] a return exceeding the discounted price it paid for the asset." Nickey Gregory Co., LLC v. AgriCap, LLC, 597 F.3d 591, 601 (4th Cir. 2010).

viewed as dispositive if, in light of all of the other circumstances, it appears that the substance of the bargain was otherwise." Boerner, 577 P.2d at 207.

As one court has noted, "[a]ccounts receivable financing is an uncertain area in the usury law and no exact tests have been formulated." Baruch Inv. Co. v. Huntoon, 257 Cal. App. 2d 485, 492 (Cal. App. 1968).  However, case law does reflect a common set of elements considered by courts in determining whether a particular transaction constitutes a sale or a loan.  Those factors include (1) whether the transaction is non-recourse;[11] (2) whether the seller's creditors are notified that payments are to be made to the buyer of the accounts and/or whether the buyer takes responsibility for account collection;[12] and (4) the intent of the parties.[13]

Generally speaking, the transactions underlying the Claims took the form of transfers of Tuckerman Steel's accounts receivable to RPP for a set profit (in most cases, 10% of the face amount of the invoice) and without recourse.  Joseph testified that:

> Mr. Johnson would buy the invoice, he'd pay us early for that invoice and he would charge a 10 percent interest rate for his moneys.  And, then, when the invoice became due from the general contractor, he would receive his – his money … We could call up Mr. Johnson and say … we have an invoice that's been approved, it's due to be paid back in a week, a month, would you be interested in helping us secure some cash flow in return for 10 percent?

Dec. 15, 2015 Trial Transcript 18:8-22.  According to Johnson, once an invoice was

---

[11] See, e.g., Agricap, 597 F.3d at 601, 602; Carter, 97 S.W.3d at 397-98; Baruch, 257 Cal. App. 2d at 493-95.

[12] See, e.g., Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc., 602 F.2d 538, 546 (3d Cir. 1979); Wiers Farm, Inc. v. Waverly Farms, Inc., 2011 WL 1296867 (M.D. Fla. Mar. 31, 2011); In re Siskey Hauling Co., Inc., 456 B.R. 597, 607 (Bankr. N.D. Ga 2011); Carter, 97 S.W.3d at 396-97, 398-99; Korrody, 126 S.W.3d at 227; Baruch, 257 Cal. App. 2d at 492-93.

[13] See, e.g., Carter, 97 S.W. 3d at 399; Korrody, 126 S.W.3d at 226.

purchased, he considered RPP to be the owner of the invoice and the bearer of the risk

of non-payment.  He viewed the transactions as non-recourse – i.e., RPP could not look

to Tuckerman Steel or Joseph in the event the end-customer paid late or not at all.[14]

RPP's profit did not increase in the event of delayed payment as would be expected in a

loan context.  And, even after discovering Tuckerman Steel had been converting funds

that rightfully should have been earmarked for RPP, RPP did not seek repayment from

Tuckerman Steel.  Rather, Johnson requested that Joseph execute a letter memorializing

the parties' deal with respect to repayment of funds and promising to notify RPP

immediately upon notice and/or receipt of any payments for invoices submitted to

customers in which RPP had an interest.

These elements – the non-recourse nature of the transactions and the pre-

determined discount – weigh heavily in favor of finding that the transactions at issue here

were true sales and not loans.  Once an invoice was purchased, both Joseph and

Johnson treated those invoices as RPP's problem; the risk of non-collection fell squarely

on RPP and RPP could not demand repayment of the purchase price from Tuckerman

Steel.  "When a buyer of accounts receivable holds substantial recourse against the

seller, thereby shifting all risk of non-collection on the seller, courts have routinely held

the transaction to be a financing arrangement and not a sale."  Siskey Hauling, 456 B.R.

at 607; see also Wiers Farm, 2011 WL 1296867 at 3-4 (factoring agreement did not

provide for true purchase of accounts receivable where factor "did not agree to assume

the risk of nonpayment on all accounts"); Major's Furniture, 602 F.2d at 546 (holding that

---

[14] For example, Johnson testified, "Well, I would have had to get a - - since I had no contract with
them, I would have had to get an assignment from Tuckerman Steel and then proceed to try and
collect my money."  Jan. 19, 2016 Trial Transcript 16:3-5.

a sale of accounts receivable was a loan, as "none of the risks present in a true sale is present here").  Here, the risk of non-collection was shifted to RPP, indicating that the transactions are properly characterized as "sales."

But the Debtor contends that RPP did not exercise "ownership" over the accounts receivable because RPP did not notify Tuckerman Steel's customers to make payments directly to RPP and left collection of the invoices within Tuckerman Steel's hands.  While "[n]otification normally indicates a sale, and non-notification normally indicates a loan," Baruch, 257 Cal. App. 2d at 493, this factor alone is not determinative.  Where direct collection of accounts by the buyer of the accounts is not feasible or practical, the seller's retention of control over account collection does not automatically militate in favor of finding a loan transaction.  See, e.g., Korrody, 126 S.W.3d at 227; Carter, 97 S.W.3d at 398-99.  In this case, Johnson credibly testified that the nature of Tuckerman Steel's pre-existing contracts with its customers made it difficult or impossible for RPP to invoice the end-customer directly, and the Court does not view the notification and collection issue as outcome-determinative.

Instead, the Court finds that the non-recourse nature of the transactions and the parties' intent are dispositive here.  Without any formalized agreement, the intent of the parties is essential to determining whether the parties were involved in non-recourse factoring or whether their transactions should be construed as loans to which usury statutes apply.  Korrody, 126 S.W.3d at 226.    It is clear from the evidence and the testimony of the parties that both treated the invoices purchased by RPP as RPP's property.  Both RPP and Johnson understood that RPP would recoup its money when the invoices were paid.  It was only when those invoice payments were *not* turned over to

20

RPP that Johnson turned to Joseph to collect. Those collection efforts against Joseph were not initiated because RPP sought recompense for uncollectible accounts; instead, RPP turned its collection efforts to Joseph and Tuckerman Steel to recoup payments on accounts which rightfully belonged to RPP. Accordingly, the Court holds that the financial transactions forming the basis for the debt embodied in the promissory notes constituted factoring arrangements – the sale and purchase of accounts receivable – and are not subject to the Massachusetts Usury Statute. The Court will therefore issue judgment in favor of RPP on Count VIII. Furthermore, because the Debtor's Chapter 93A and Illegality claims are based on RPP's charging of usurious interest rates, the Court will also enter judgment in favor of RPP on Counts VI and IX.

### C.   Validity & Enforceability of First and Second Vineyard Notes and Mortgages

#### 1.   *The First Vineyard Note and Mortgage*

The Debtor says that the First Vineyard Note should be declared void because the only payee is Johnson, individually, when it was RPP that was owed the debt. In reaching this conclusion, the Debtor says that the description of the payee, "Raymond B. Johnson III, individually and/or as President of Raymond Piling Products, Inc.," is merely a double reference to Johnson, individually.

This Court finds the Debtor's suggested reading of the First Vineyard Note to be untenable. A plain reading of the phrase "Raymond B. Johnson III, individually and/or as President of Raymond Piling Products, Inc." does not lead to the conclusion that the documents refer twice to Johnson individually. That interpretation would require the Court to treat the words "and/or as President of Raymond Piling Products, Inc." as mere surplusage. Rather, a logical and plain reading leads to the conclusion that the phrase

"as President of Raymond Piling Products" explains that Johnson executed the documents both in his individual capacity and as the authorized representative of RPP. To the extent the phrase is ambiguous, the evidence and testimony was clear that all parties considered RPP to be a holder of the First Vineyard Note and mortgagee under the First Vineyard Mortgage.

The Debtor further attempts to attack the First Vineyard Note and Mortgage by claiming that the First Vineyard Mortgage is unenforceable against her because she is not personally liable under the First Vineyard Note. As noted earlier, the Debtor did *not* sign the First Vineyard Note in her individual capacity, but only in her capacity as trustee, a fact which the Defendants acknowledge. See, supra, fn. 7.  Thus, the Court agrees with the Debtor that the First Vineyard Note is not enforceable as a personal obligation as to her. But that does not render the First Vineyard *Mortgage* void or unenforceable.

Under Massachusetts law, a promissory note is nothing more than a written contract for the payment of money, subject to the fundamental rules governing contract law.  T. Butera Auburn, LLC v. Williams, 83 Mass. App. Ct. 496, 505-506 (2013).  An enforceable contract requires consideration – a bargained-for exchange in which there is a legal detriment to the promisee or a corresponding benefit to the promisor.  Neuhoff v. Marvin Lumber and Cedar Co., 370 F.3d 197, 201 (1st Cir. 2004).  "Massachusetts law recognizes that "[a] mortgage . . . may exist without there being any debt or personal liability of the mortgagor."  In re D&S Contractors, Inc., 422 B.R. 1, 5 (Bankr. D. Mass. 2010) (quoting Perry v. Miller, 330 Mass. 261, 263, 112 N.E.2d 805 (1953)).  As between Joseph and the Defendants, there is no question that the First Vineyard Note is adequately supported by consideration, and no argument has been raised attacking the

validity of the note as between those parties.  Therefore, this Court reaches the same conclusion that was reached in D&S Contractors, and rules that "[a]lthough the Debtor is not obligated on the Note, the Mortgage remains valid, particularly as there was consideration for the Mortgage loan." Id. at 4.

And the Debtor's lack of consideration argument fails on a separate ground. The Supreme Judicial Court of Massachusetts has held that "[a] married woman may … become surety for her husband … and may give a valid mortgage of her separate estate to secure the payment by him of his indebtedness to a mortgagee although she had no interest in the debt." Perry, 112 N.E. 2d at 806.  The court concluded that "a mortgage given by a wife for such a purpose requires no consideration."  Id. at 807; In re Rapoza, 2002 WL 34694093 (B.A.P. 1st Cir. June 28, 2002).  Because the Debtor was married to Joseph when the First Vineyard Note was signed, the mortgage she granted to secure the payment of his indebtedness to RPP required no separate consideration.

For all these reasons, the Court finds and rules that the First Vineyard Mortgage is valid and enforceable as to the Debtor and against the Vineyard Property under Massachusetts law.

> 2.    *The Second Vineyard Note and Mortgage and the Forbearance Agreement*

With respect to the Second Vineyard Note and Mortgage, the Debtor's argument depends entirely on the Court finding that the First Vineyard Note and Mortgage are unenforceable. Under the Debtor's theory, if the First Vineyard Note and Mortgage are unenforceable as against the Debtor, then she received no consideration from the Defendants to sign the Second Vineyard Note and Mortgage in exchange for the Defendants agreeing not to enforce those unenforceable agreements.  But the Court *has*

found the First Vineyard Note and Mortgage to be enforceable.

The Second Vineyard Note and Mortgage, as well as the Forbearance Agreement, are thus adequately supported by consideration: the Defendants agreed to freeze principal and interest amounts, payments due under the First and Second Vineyard Notes were suspended, and the Debtor was given a six-month period of time to market and sell the Vineyard Property to satisfy the debt.

In addition, reaching an agreement with Johnson and RPP at that particular point in time was crucial to the Debtor's fledgling foray into the steel business.  The Debtor's ability to access the good will, business, and funding of RPP in the early stages of BBS's business was critical to BBS's success, and without the considerable amount of work sent BBS's way by RPP, BBS might have failed.  Accordingly, this Court finds that valid consideration existed for the Second Vineyard Note and Mortgage and the Forbearance Agreement and each of the three documents are valid and enforceable against the Debtor personally.

### D.    Equal Credit Opportunity Act

The Equal Credit Opportunity Act was passed by Congress in 1974 in order to prevent credit discrimination based on gender or marital status.  Federal Reserve System, Prop. Rules to Reg. B of the ECOA, 60 Fed. Reg. 20436, 20437 (April 26, 1995). Congress's initial goal was to prohibit lenders from discriminating against women by stopping the practice of lenders requiring wives to obtain their husbands' co-signatures on credit applications.  Anderson v. United Fin. Co., 666 F.2d 1274, 1277 (9th Cir. 1982). Section 1691(a) of the ECOA provides in pertinent part that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit

24

transaction … on the basis of … sex or marital status."  15 U.S.C. § 1691(a)(1).  And under Regulation B of the ECOA, promulgated by the Federal Reserve Board, "[a] creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested."  12 C.F.R. § 202.7(d)(1).

But the ECOA applies only to a "creditor," defined as: "any person who *regularly* extends, renews, or continues credit; any person who *regularly* arranges for the extension, renewal or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew or continue credit…."  15 U.S.C. § 1691a(e) (emphasis supplied).  And under the applicable regulations a creditor is defined as "a person who, *in the ordinary course of business*, *regularly* participates in a credit decision, including setting the terms of the credit."  12 C.F.R. § 202.2(l) (emphasis supplied).

RPP, however, does not extend credit in the ordinary course of its business. The Debtor has not alleged that RPP entered into financing arrangements with any entity other than Tuckerman Steel or that RPP regularly arranges credit for its customers.  Instead, the overwhelming weight of the evidence demonstrated that RPP is a steel re-seller, distributor, and fabricator and engaged in the financing transactions only with Tuckerman Steel.  Given the lack of evidence that RPP regularly extends credit in the ordinary course of its business, the Court concludes that the provisions of the ECOA do not apply.

But even if RPP *did* qualify as a creditor under the ECOA, the circumstances here fall within one of the ECOA's exceptions to the general prohibition against requiring a spouse's guaranty.  Under 12 C.F.R. § 202.7(d)(4), a creditor may require the signature

25

of the applicant's spouse or other person on any instrument necessary, *or reasonably believed by the creditor to be necessary*, under applicable state law to make the property being offered as security available to satisfy the debt in the event of default.  See Moran Foods, Inc. v. Mid-Atlantic Market Dev. Co., LLC, 476 F.3d 436, 442 (7th Cir. 2007).  Here, both Joseph and Johnson testified that Johnson required the Debtor's signature on the documents only after reviewing the property deed and discovering that Joseph did not individually own the Vineyard Property.  Accordingly, the Debtor's signature was reasonably believed to be (and most likely was actually) necessary for RPP to obtain a valid and enforceable security interest in the Vineyard Property.  Requiring that signature did not run afoul of the ECOA.

The Court also finds that the Debtor waived her right to defend against enforcement of the Claims by knowingly and voluntarily signing the Forbearance Agreement and binding herself to the terms of the Waiver.  In that Waiver, the Debtor unequivocally "waive[d] . . . each and every defense, setoff and/or counterclaim to the payment of the[ ] liabilities . . . and [Johnson and RPP] . . . [were] released, remised, and forever discharged from any and all claims. . . ."  Def. Ex. 265, at 3 ¶ 3.  Such a waiver prevents the Debtor from recovering under the ECOA.  See Ballard v. Bank of America, 734 F.3d 308, 313-14 (4th Cir. 2013); RL Regi North Carolina, LLC v. Lighthouse Cove, LLC, 367 N.C. 425, 430 (2014).

### E.   Amounts of the Claims

Having determined that the First Vineyard Mortgage is enforceable against the Debtor's interest in the Vineyard Property and that the Second Vineyard Note and Mortgage and the Forbearance Agreement are enforceable against the Debtor, the Court

must next turn to the validity of the amounts asserted in the Claims.

As detailed earlier, neither party provided the Court with a coherent calculation as to the amounts due under the First and Second Vineyard Notes. The Debtor simply asserted that the initial principal amounts of the notes should be recalculated based on the Schneider report. And the Defendants have provided inconsistent calculations based on varying initial principal amounts and interest calculations, and at times also relying on portions of the Schneider report, in explaining why the face amount of the Claims is justified.

And so the Court turns to the ever-trusty Ockham's Razor.[15]

The parties agree that the First Vineyard Note was made in the principal amount of $2,077,886.39. It provides for a 15-year amortization schedule, with a 5% per annum interest rate and an 8% default rate. See Amended Joint Pretrial Statement, at 2 ¶ 5; Pl. Ex. 1. The parties agree that the Second Vineyard Note was made in the principal amount of $192,271.68. Payments were to be made in 144 installments based upon a direct amortization schedule, with a 5% per annum interest rate and an 8% default rate. See Amended Joint Pretrial Statement, at 2 ¶ 6; Pl. Ex. 3. Neither the First nor the Second Vineyard Notes are ambiguous as to the amount of principal or the calculation of interest. "Under Massachusetts law, parol evidence may not be admitted to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists. ITT Corp. v. LTX Corp., 926 F.2d 1258, 1261 (1st Cir. 1991). And *both* parties signed the Forbearance Agreement in which they *both* agreed and acknowledged that, as of January 27, 2012, "$2,202,918.80 in principal, together with interest, late fees, attorney's fees, and other

---

[15] "With all things being equal, the simplest explanation tends to be the right one." – William of Ockham

costs and charges" were due.  Neither can now be heard to complain that the amounts reflected in the unambiguous contracts they both signed are somehow "incorrect."  <u>See Bulmer v. MidFirst Bank, FSA</u>, 59 F.Supp.3d 271, 275-76 (D. Mass.  2014) (execution of forbearance agreement foreclosed later dispute regarding balance due under original promissory note).

Neither party has provided the Court with sufficient evidence to calculate the amounts due pursuant to the express terms of the First and Second Vineyard Notes, which terms control.  Accordingly, the Court will set a deadline for the parties to submit calculations of the amounts owed based on the terms of the notes accompanied by a coherent explanation of that calculation, following which the Court will enter an order allowing Claims 6 and 9 in the amount it deems justified based on those submissions, but in no event in an amount exceeding the face amounts of the Claims.

Both the First and Second Vineyard Notes provide for the recovery of costs of collection, including reasonable attorney's fees.  It is likely, however, that the amount due and owing on the First Vineyard Note exceeds the amount remaining from the sale of the Vineyard Property currently held in escrow.  If Claim 6 is undersecured, the deficiency on that claim will not be allowed as an unsecured claim against the Debtor inasmuch as, as previously found, the Debtor is not personally liable on the First Vineyard Note.  Claim 9 is likely to be wholly unsecured, but any unsecured portion will be an allowable claim (up to but not exceeding the face amount listed on Claim 9) against the Debtor's estate, inasmuch as, as previously found, the Debtor *is* personally liable on the Second Vineyard Note.

IV.    CONCLUSION

For all of the foregoing reasons, the Court finds in the Defendants' favor on all remaining counts of the Complaint and will issue an appropriate Judgment forthwith.[16] The Court will order the parties to file calculations regarding the amounts of Claims 6 and 9, following which the Court will issue an order clarifying the allowed amounts of the Claims.

By the Court,

_____

DATED: July 12, 2016                    Henry J. Boroff
                                        United States Bankruptcy Judge

---

[16] Because the relief sought through the Defendants' remaining counterclaims is duplicative of RPP's recovery on account of its Claims, those counterclaims will be dismissed as moot.